1

2

3

4

5

6                **IN THE UNITED STATES DISTRICT COURT FOR THE**

7                     **EASTERN DISTRICT OF CALIFORNIA**

8

9   **JASVIRO MUNDI, as successor**  )      No. CV-F-06-1493 OWW/TAG
    **in interest to Harnam Singh**   )
10  **Mundi,**                        )      **ORDER DENYING DEFENDANT'S**
                                      )      **MOTION TO COMPEL ARBITRATION**
11                                    )      **(Doc. 22)**
                                      )
12                    **Plaintiff,**   )
                                      )
13           **vs.**                   )
                                      )
14                                    )
                                      )
15  **UNION SECURITY LIFE INSURANCE** )
    **COMPANY, et al.,**              )
16                                    )
                                      )
17               **Defendant.**        )
                                      )
18  _____ )

19      Before the Court is Defendant Union Security Life Insurance

20  Company's (USLIC) motion to compel arbitration and to stay all

21  proceedings in this case during the pendency of arbitration.

22      A.   <u>BACKGROUND</u>.

23           1.   <u>ALLEGATIONS IN PLAINTIFF'S COMPLAINT</u>.

24      Plaintiff, Jasviro Mundi, as successor in interest to Harnam

25  Singh Mundi, filed a Complaint for Breach of Contract and Breach

26  of the Implied Covenant of Good Faith and Fair Dealing on

                                    1

September 11, 2006 in the Fresno County Superior Court. The
action was removed to this Court based on diversity of
citizenship on October 4, 2006.

The Complaint alleges that Plaintiff is the widow of Harnam
Singh Mundi.  The First Cause of Action for breach of contract
alleges in pertinent part:

> 7.  On or about May 26, 2004, Decedent
> obtained a home equity line of credit with
> Wells Fargo Bank, N.A. ... The line of credit
> was secured by the family home of Decedent
> and Mrs. Mundi, the plaintiff ... At that
> time, Decedent was also offered life
> insurance designed to pay off his line of
> credit up to a maximum amount of $50,000.00
> Decedent purchased that insurance.

> 8.  On or about May 26, 2004, in
> consideration of the payment of an [sic]
> monthly premium made by Decedent, defendant,
> by its duly authorized agents, executed and
> delivered to plaintiff in Fresno ..., its
> policy of insurance ... wherein defendant
> insured plaintiff's life in the sum of up to
> $50,000.00 from May 26, 2004.

> 9.  The term was extended on a monthly basis
> by payment of the monthly premiums, and at
> all times herein mentioned, the policy was,
> and is, in full force and effect.

> 10.  The policy, among other things, provides
> that upon Decedent's death, a benefit would
> be paid in the amount outstanding on
> Decedent's Home Equity Line of Credit up to a
> maximum benefit of $50,000.00.

> ...

> 13.  On September 12, 2005, Decedent was
> murdered.

> 14.  On that date the amount outstanding on
> his line of credit with Wells Fargo exceeded
> $50,000.00.  The amount of credit outstanding
> still exceeds $50,000.00.

2

1

2

3

4

          15.  On September 27, 2005, Plaintiff
initiated a claim with Defendant on the
policy and requested that the policy make
payment on the line of credit.  Defendant
failed and refused, and continues to fail and
refuse to make payment on the policy, in
whole or in part.

5  The Second Cause of Action for breach of the implied covenant of

6  good faith and fair dealing alleges in pertinent part:

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

          18.  Defendants breached the implied covenant
... in connection with the insurance policy
by unreasonably failing to pay under the
policy without proper cause.  Defendants
failed to properly and adequately investigate
plaintiff's claim and unreasonably denied
Plaintiff's claim based on a [sic]
unjustified and invalid position that
Decedent had materially and knowingly
misrepresented his health on the application
and that said alleged misrepresentation
entitled Defendants to rescind the policy.
In addition, Decedent was effectively not
asked the application question that defendant
seeks to rely upon.  Decedent, whose grasp of
the English language was poor, at best (which
defendant's agents knew), obviously did not
and could not appreciate the question in the
manner asserted by Defendants, nor would an
ordinary lay person, English speaker or not,
understand the question in the manner
asserted by Defendants.  Further, Defendants
actually set up an impossible situation for
Decedent insofar as Defendants asked
fundamentally personal and private questions
as part of a loan transaction where his
business partner was both present and given
access to the questions without any provision
for privacy whatsoever.

22

23

24

25

26

          19.  Defendants represented and Decedent
believed that he had appropriately answered
all questions necessary and disclosed all
issues necessary to validly obtain and
receive benefits under the insurance policy
in the event of his death.  Defendants'
above-stated representations were false and
fraudulent in that defendant never intended
to pay out Decedent's valid claims under the

3

policy and Defendant did not investigate or inquire about Decedent's health condition at all or in a manner which Decedent could have reasonably expected to understand.  At the time defendant entered into the insurance contract with Decedent, defendant knew and willfully concealed the above facts, all for the purpose of defrauding and deceiving plaintiff [sic] and inducing him to purchase the policy.

20.  Decedent, at the time the representation was made, believed it to be true and, in reliance on it, was induced to, and did, enter into the insurance contract with defendant; had Decedent known the true facts, he would not have purchased the policy.

21.  At all times herein material, defendant knew that Decedent's death was insured under the policy and that the beneficiary should have been paid under the policy.

22.  Notwithstanding defendant's knowledge of its obligation, Defendant failed and refused to pay under the policy despite Plaintiff's demand that it do so.

23.  For the sole purposes [sic] of compelling plaintiff to fail to pursue payment under the policy or, if she persisted in seeking payment, to incur substantial detriment, delay, and additional expenditures in pursuing enforcement of his [sic] claim, all during which time defendant would retain use of the money, defendant, in breach of its covenant of good faith and fair dealing, intentionally, maliciously, and oppressively refused and failed to pay the insured amount of the balance due on the line of credit.

24.  As a direct and proximate cause of defendant's wrongful conduct as herein alleged, plaintiff was compelled to incur costs, make payments on the Wells Fargo loan in an amount according to proof, and to retain an attorney to collect under the policy.

2.  <u>ARBITRATION AGREEMENT</u>.

4

1        An "EquityLine with FlexAbility (SM) Agreement and

2   Disclosure Statement" (hereafter referred to as the EquityLine

3   Agreement) was entered into by Wells Fargo Bank, Gurdip S. Gill,

4   and Harnum S. Mundi on May 26, 2004.  Section 25 of the

5   EquityLine Agreement provided:

6            SECTION 25: ARBITRATION

7            <u>RESOLVING DISPUTES - ARBITRATION</u>

8            ... [I]f the Bank and I are not able to
             resolve our differences informally, I agree
9            that any dispute between me and the Bank,
             regardless of when it arises or arose, will
10           be settled using the following procedures.

11           I UNDERSTAND AND AGREE THAT THE BANK AND I
             ARE WAIVING THE RIGHT TO JURY TRIAL BEFORE A
12           JUDGE IN A PUBLIC COURT ....

13           <u>DISPUTES</u>

14           A dispute is any unresolved disagreement
             between the Bank and me that relates in any
15           way to accounts, loans, services or
             agreements subject to this Arbitration
16           provision.  It includes any claims or
             controversy of any kind, which arise out of
17           or are in any way related to these accounts,
             loans, services or agreements.  It includes
18           claims based on broken promises or contracts,
             tort (injury caused by negligent or
19           intentional conduct), breach of fiduciary
             duty or other wrongful actions.  It also
20           includes statutory, common law and equitable
             claim. [sic] A dispute also includes any
21           disagreement about the meaning of this
             Arbitration Section and whether a
22           disagreement is a 'dispute' subject to
             binding arbitration as provided for in this
23           Arbitration Section.  No dispute may be
             joined in an arbitration with a dispute of
24           any other person or arbitrated on a class
             action basis.  Furthermore, I agree that any
25           arbitration I have with the Bank shall not be
             considered with any other arbitration and
26           shall not be arbitrated on behalf of others

5

1      with the consent of both me and the Bank.

2      B.   **MOTION TO COMPEL ARBITRATION**.

3      USLIC moves to compel arbitration of Plaintiff's claims

4 against it in this action pursuant to the arbitration provisions

5 in the EquityLine Agreement between Wells Fargo, Gill and

6 Decedent.  USLIC contends that Plaintiff's allegations "are made

7 against USLIC, an insurer that provided group coverage to Wells

8 insuring credit account debts on its loans through individual

9 certificates of life coverage" and, therefore, Plaintiff should

10 be compelled to submit all of her claims to arbitration.  USLIC

11 refers to a copy of "Wells Credit Insurance Borrower Disclosure

12 and Authorization" as being attached as Exhibit A to its motion.

13 However, no such exhibit is attached.

14      Plaintiff is signatory to the EquityLine Agreement as a co-

15 borrower.  USLIC acknowledges that it is not a signatory to the

16 EquityLine Agreement, but contends that it may enforce its

17 arbitration provisions because Plaintiff must rely on the

18 EquityLine Agreement in order to assert her claims against USLIC.

19      "Although arbitration is a contractual right that is

20 generally predicated on an express decision to waive the right to

21 trial in a judicial forum, this court has held that the lack of a

22 written arbitration agreement is not an impediment to

23 arbitration."  *Sunkist Soft Drinks, Inc. v. Sunkist Growers,*

24 *Inc.*, 10 F.3d 753, 756-757 (11th Cir.1993).  As explained in

25 *Cromer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir.2006):

26      ... Equitable estoppel 'precludes a party

from claiming the benefit of a contract while simultaneously attempting to avoid the burdens that contract imposes.' ... In the arbitration context, this principle has generated two lines of cases.

Under the first of these lines, *nonsignatories* have been held to arbitration clauses where the nonsignatory 'knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement.' ... Under the second line of cases, *signatories* have been required to arbitrate claims brought by nonsignatories 'at the nonsignatory's insistence because of the close relationship between the entities involved.'

In *MS Dealer Service Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir.1999), the Eleventh Circuit held:

[E]quitable estoppel applies when the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims against the nonsignatory ... When each of a signatory's claims against a nonsignatory 'makes reference to' or 'presumes the existence of' the written agreement, the signatory's claims 'arise[] out of and relate[] directly to the [written agreement,' and arbitration is appropriate.

USLIC argues that the arbitration provisions of the EquityLine Agreement should be enforced under these principles because the substantive allegations of the Complaint rely on the existence of the line of credit, e.g., Paragraphs 7,8, 14-16, 18, 23-24, and because the alleged failure to pay the line of credit debt is the basis for the claim of liability.  USLIC contends:

Here, Plaintiff's claims are inextricably bound to the credit line, from the inception of the insurance through the processing of the claim for benefits.  The group policy was issued to the signatory company, Wells.

7

> Plaintiff acknowledges the intertwining of
> the insurance contract with the contract for
> the line of credit.  *See* Compl., ¶ 7 ('at the
> same time' Mr. Mundi obtained the line of
> credit, he 'was also offered life insurance
> designed <u>to pay off his line of
> credit</u>')(emphasis added).  Plaintiff alleges
> that USLIC failed and refused to make a
> payment on the certificate of insurance in
> the amount of Plaintiff's decedent's line of
> credit.  Compl, ¶¶ 15-16.  The amount of the
> policy benefits is determined that the terms
> of the credit line.  The sole reason for the
> credit life insurance is to pay credit line
> debt in the event of death.

These facts, USLIC argue, clearly meet the applicable federal

standard and establish that Plaintiff's claims are intertwined

with the EquityLine Agreement.

Plaintiff acknowledges that the insurance policy states that

the amount of coverage is based on the amount outstanding on the

line of credit at the time a claim arises.  However, Plaintiff

does not concede that USLIC's obligation arises out of and is

related to the EquityLine Agreement between Decedent and Wells

Fargo:

> In the instant action, there can be no real
> claim that the terms of the Wells Fargo
> Agreement must be relied upon to assert
> Plaintiff's claims.  There is a difference
> between relying on the existence of an
> agreement and looking to its terms to resolve
> a dispute over what duties are owed.  In the
> instant action, the relevance of the Wells
> Fargo Agreement is simply its existence -
> i.e. to establish that a line of credit
> existed and what the amount owing was as of
> the date of the decedent's death.

Plaintiff contends that, in each of the cases where a signatory

has been compelled to arbitrate with a non-signatory, the actual

8

terms of the agreement containing the arbitration clause were at issue.

In *Boucher v. Alliance Title Company, Inc.*, 127 Cal.App.4th 262 (2005), Plaintiff entered into a written employment agreement with Financial by which Plaintiff was entitled to a specified incentive compensation.  The employment agreement could not be modified, waived or discharged except in a writing signed by plaintiff and Financial.  Financial transferred all of its Southern California operations and assets to Defendant, alleged to be a wholly separate and distinct corporate entity.  Plaintiff alleged that he was notified that he would be working for Defendant and that he was obligated to allow unilateral modifications by Defendant to the employment agreement, including a modified and lesser incentive compensation package.  Defendant refused to honor Plaintiff's employment agreement with Financial and Plaintiff refused to enter into a new agreement with Defendant.  Thereafter, Plaintiff was terminated.  Plaintiff then sued Financial and Defendant, alleging numerous causes of action arising out of the dispute.  Financial and Defendant moved to compel arbitration, relying on the arbitration provision in the employment agreement between Plaintiff and Financial.  The trial court compelled arbitration as to Financial but denied arbitration as to Defendant.  In reversing, the Court of Appeals held in pertinent part:

> To summarize, under both federal and
> California decisional authority, a
> nonsignatory defendant may invoke an

arbitration clause to compel a signatory
plaintiff to arbitrate its claims when the
causes of action against the nonsignatory are
'intimately founded in and intertwined' with
the underlying contractual obligations ... By
relying on contract terms in a claim against
a nonsignatory defendant, even if not
exclusively, a plaintiff may be equitably
estopped from repudiating the arbitration
clause contained in that agreement ... The
focus is on the nature of the claims asserted
by the plaintiff against the nonsignatory
defendant ... That the claims are cast in
tort rather than contract does not avoid the
arbitration clause ... The fundamental point
is that a party may not make use of a
contract containing an arbitration clause and
then attempt to avoid that duty to arbitrate
by defining the forum in which the dispute
will be resolved ....

Plaintiff's claims against defendant rely on,
make reference to, and presume the existence
of the June 5, 2003, employment agreement
with Financial.  In his first four of six
causes of action, plaintiff alleges:
defendant failed to pay him accrued wages,
including incentive compensation, due under
the terms of the June 5, 2003, employment
agreement and the Labor Code; defendant's
failure to pay plaintiff accrued wages and
incentive compensation due under the June 5,
2003, employment agreement entitled him to
penalties under the Labor Code; defendant
breached the June 5, 2003, employment
contract causing plaintiff damages in the
form of lost earnings and other employment
benefits due under that agreement; defendant
breached the covenant of good faith and fair
dealing implied in the June 5, 2003,
employment agreement; and the failure to pay
wages due, requiring plaintiff to reject the
June 5, 2003, employment contract, and asking
plaintiff to disclose confidential
information in violation of that contract,
amounted to unlawful, unfair, or fraudulent
business acts.  Each of the foregoing causes
of action is brought against *both* defendant
and Financial.  Each of the foregoing claims
makes reference to and relies on the June 5,
2003, employment agreement.  In addition,

10

                    **plaintiff alleges defendant intentionally or negligently disrupted plaintiff's performance of the June 5, 2003, employment agreement. Further, plaintiff claims that defendant, by breaching the June 5, 2003, contract, intentionally interfered with his prospective economically advantageous relationships with clients. These claims all make reference to and presume the existence of the validity of the June 5, 2003, employment contract. In addition, Financial and defendant were both owned, at least in part, by the same entity, Mercury. Under these circumstances, plaintiff's claims against defendant are intimately founded in and intertwined with the June 5, 2003, employment agreement; therefore, he is equitably estopped from avoiding arbitration of his causes of action against defendant.**

**124 Cal.App.4th at 271-273.**

     **In *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524 (5th Cir.), *cert. denied*, 531 U.S. 1013 (2000), movie producers and the trustee for the movie brought suit against an actor and his agent, alleging that defendants had tortiously interfered with a distribution agreement by pressuring the distributor to limit the release of the movie. The Eleventh Circuit upheld the district court's granting of a motion to compel arbitration, holding in pertinent part:**

                    **The district court did *not* abuse its discretion by concluding 'that Plaintiffs' claims are so intertwined with and dependent upon the Distribution Agreement that the arbitration agreement within the Distribution Agreement should be given effect'. This conclusion is compelled by comparing the complaint (the operative facts for purposes of the motion to compel arbitration) with the distribution agreement (an exhibit to the complaint). This is quickly and amply demonstrated with but a few examples.**

The distribution agreement is *not* the only contract for which tortious interference is claimed. Creative Artists is also charged with such interference with McConaughey's actor's contract for the movie (another exhibit to the complaint); he is charged with breach of that contract. Among other things, he was required by that actor's contract to allow use of 'his name and photographs ... for commercial and advertising purposes.'

The complaint uses that specific requirement in the actor's contract in describing how, for the theatrical release (as defined in the distribution agreement) mandated by the distribution agreement, TriStar

> had planned to distribute Chainsaw movie posters prominently featuring the likeness and name of McConaughey and, in fact, had printed posters reflecting this plan. Creative Artists, acting for McConaughey, contacted Columbia Tristar and successfully pressured it to retreat from its plan for the posters on the grounds that McConaughey's fame should not be exploited in such a manner in connection with the Chainsaw movie.

This is but part of the charged interference. In addition, the complaint alleges that the theatrical release was delayed initially to take advantage of Zellweger's post-movie success in another movie, *also released by TriStar*; that the plan changed to take advantage of both actors' success; that Creative Artists, on behalf of McConaughey, 'pressured' TriStar to *not* make a major release of the movie and, instead, to make only a limited one, to Appellants' great financial detriment; and that, because of Defendants' actions, '*TriStar failed to exercise its good faith judgment in promoting, exploiting, and distributing*' the movie ....

As is obvious from the foregoing, and as the district court concluded, these allegations and claims are intertwined with, and

12

dependent upon, the distribution agreement.
In addition to Appellants relying on the
terms of the agreement in asserting their
claims, TriStar and Defendants are charged
with interdependent and concerted misconduct.

The distribution agreement, in describing the
movie, lists Zellweger and two others as
'starring' in it; *McConaughey is not so
listed*.  All rights to the movie are given to
TriStar; and, subject to it making a required
minimum expenditure in connection with the
theatrical release, TriStar has '*absolute
discretion* concerning the exploitation of the
[movie] in any and all media.' ...

In that provision, which obviously lies at
the heart of this action, Appellants

　　　agree[d] that the *good faith
　　　judgment* of [TriStar] regarding any
　　　matter affecting the exploitation
　　　of the [movie] shall be binding and
　　　conclusive upon [Appellants]
　　　([TriStar] shall make the
　　　determination, *within its sole
　　　discretion*, whether or not to
　　　release the [movie] in a given
　　　media and/or in a given territory).

... 'Territory' includes, with some
exceptions, '[t]he entire universe', while
'media' includes, but is *not* limited to,
movie theaters.

And, as noted, the distribution agreement's
arbitration clause pertains, *inter alia*, to
the 'interpretation of [the distribution]
agreement, ... the performance by the Parties
of their respective obligations [there]under,
and ... all other causes of action (whether
sounding in contract, *or in tort*) arising out
of *or relating to* this Agreement.' ...

In short, the scope of the distribution, the
'discretion', both 'absolute' and 'sole',
vested in TriStar, and its 'good faith
judgment' are at the center of this dispute.
Among other things, TriStar is charged with,
as a result of the claimed interference
('pressure'), *not* using its 'good faith

13

judgment'.  Although *not* sued (an obvious
attempt to make an end-run around the
arbitration clause ...), TriStar nevertheless
will be involved extensively - in this
dispute, including whether it performed
properly under the distribution agreement.

As stated, the foregoing are but a few
examples of the intertwining of the claims
with the distribution agreement, including
the claimed concerted actions by Defendants
(non-signatories), with TriStar, a signatory.
How possible damages might be computed, in
the light of the detailed 'accounting'
provisions of the agreement, is but another
example.

210 F.3d at 528-530.

*In re Currency Conversion Fee Antitrust Litigation*, 265
F.Supp.2d 385 (S.D.N.Y.2003) involved class actions brought by
credit card holders challenging alleged foreign currency
conversion policies by credit card networks and their member
banks.  The District Court held that the cardholders were
estopped from avoiding arbitration with non-signatories of the
cardholder agreements:

There are several principled grounds for
finding estoppel in this action.  First, the
alleged wrongs by Bank One and BOA Corp. are
'intimately founded in and intertwined with'
the underlying agreement between First USA
and BOA and their respective cardholders.
Bank One and BOA Corp. are being sued for
their respective subsidiaries' TILA
violations and conspiracy to fix the prices
of currency conversion fees.  Both of these
claims are derivative in nature in that the
alleged wrongdoers are First USA and BOA, and
not Bank One and BOA Corp.  Further,
plaintiffs' claim against Bank One and BOA
Corp. arise from the cardholder agreements.
Specifically, it as plaintiffs' credit cards,
which are the subject matter of the
cardholder agreements, that were allegedly

14

unlawfully charged fixed conversion fees.
Also, the documents provided in connection
with plaintiffs' credit card accounts were
allegedly violative of the disclosure
obligations in TILA.  Effectively, the claims
against Bank One and BOA Corp. are the same
as those lodged against First USA and BOA,
respectively.  As such, they arise under the
'subject matter' of the agreement ....

Plaintiffs insist that they are not suing the
parent companies merely based on their
subsidiaries' actions, but that they also
allege that the parent companies were active
participants in the conspiracy.  This
contention, however, does not change the
outcome of the analysis.  Any participation
by Bank One and BOA Corp. in the alleged
conspiracy necessarily revolves around their
respective subsidiaries' issuance of credit
cards.  Those credit cards and their
respective accounts are at the heart of the
underlying contract containing the
arbitration agreement.  Therefore, this Court
finds that even the allegations that seek to
hold Bank One and BOA Corp. liable for their
own conduct arise under the 'subject matter'
of the underlying agreement between
plaintiffs and First USA and BOA.

Moreover, there is a close relationship
between First USA and Bank One, and between
BOA and BOA Corp.  Bank One is the parent
corporation of its wholly-owned subsidiary
First USA, and BOA Corp. is the parent
corporation of its wholly-owned subsidiary
BOA.  This more than satisfies the 'close
relationship' factor. ....

265 F.Supp.2d at 402-403.

In *Choctaw Generation Ltd. v. American Home Assur.*, 271 F.3d

403 (2nd Cir.2001), Bechtel was building a power-generation

facility for Choctaw.  Completion of the facility was delayed.

Bechtel claimed the delay was due to *force majeure*, Choctaw

disagreed and claimed liquidated damages in an ongoing

15

1  arbitration proceeding with Bechtel pursuant to the arbitration

2  clause of the construction contract.  To obtain payment of the

3  liquidated damages pending the outcome of the arbitration,

4  Choctaw drew down in full a $33 million letter of credit that the

5  construction contract required Bechtel to post.  In the case

6  before the Second Circuit, Choctaw demanded that American Home,

7  as surety, replenish the letter of credit as necessary until the

8  full $81 million is drawn down to fund that accruing liquidated

9  damages.  When the surety refused Choctaw's demand, Choctaw

10 commenced an action in federal court for an injunction to compel

11 serial replenishment of the letter of credit.  The Second Circuit

12 held that Choctaw's dispute with the surety was subject to

13 arbitration pursuant to the arbitration clause in the

14 construction contract:

15        The controversy between Choctaw and American
          Home under the Bond could hardly be more
16        closely bound to the dispute now in
          arbitration between Choctaw and Bechtel under
17        the Construction Contract.  The surety
          contract incorporates by reference the
18        underlying Construction Contract.  And the
          present dispute concerns the duty to
19        replenish a letter of credit maintained under
          the Construction Contract, and requires a
20        ruling as to whether that duty is independent
          of certain others in the context of the
21        Construction Contract as a whole.

22        ...

23        [T]he controversy presented on this appeal is
          linked textually to the Construction
24        Contract, and its merits are bound up with
          the dispute now being arbitrated between
25        Choctaw and Bechtel. ....

26 271 F.3d at 406-407.

                                16

In *MS Dealer Service Corp. v. Franklin*, *supra*, 177 F.3d 942, an auto buyer, Franklin, brought a state court action against an auto dealership, Jim Burke Motors, and a service corporation, MS Dealer Service Corp., alleging that they conspired in a fraudulent scheme to defraud the buyer by charging an excessive amount for a service contract.  MS Dealer filed a petition in federal court to compel Franklin to arbitrate her claims pursuant to the arbitration clause in the buyer order executed by Franklin and Jim Burke Motors.  In ruling that Franklin was compelled to arbitrate her claims against MS Dealer, the Eleventh Circuit ruled:

> ... Each of Franklin's claims against MS Dealer makes reference to and presumes the existence of the $990.00 charge contained in the Retail Installment Contract, which was incorporated by reference into the Buyers Order.  Although Franklin does not allege that the service contract has been violated or breached in any way, each of her fraud and conspiracy claims depends entirely upon her contractual obligation to pay $990.00 for the service contract.

177 F.3d at 947-948.

In *Letizia v. Prudential Bache Securities, Inc.*, 802 F.2d 1185 (9th Cir.1986), an investor brought an action Prudential Bache and its employees, alleging fraud and violation of federal securities laws.  The District Court granted a motion to compel arbitration brought by defendants.  On appeal, Letizia argued that, even if Prudential Bache may submit the dispute to arbitration pursuant to the arbitration provision in the Customer Agreement, the individual defendants, who were not signatories to

17

1  the Customer Agreement, may not.  The Ninth Circuit disagreed,

2  holding:

> ... All of the individual defendants'
> allegedly wrongful acts related to their
> handling of Letizia's securities account.
> Bache has clearly indicated its intention to
> protect its employees through its Customer
> Agreement.  We conclude that the arbitration
> clause is applicable to Kwee and Selbst.

7  **802 F.2d at 1188.**

8      Plaintiff argues that, contrary to the cases described

9  above, the causes of action against USLIC are not intimately

10  related to and founded upon the EquityLine Agreement with Wells

11  Fargo: "[T]he terms of that agreement have nothing to do with the

12  rights, duties or obligations sued upon.  The only connection to

13  Wells Fargo Agreement is the amount outstanding on the line of

14  credit was to provide the valuation of the payout due on the

15  insurance policy."

16      USLIC replies that Plaintiff's position does not accurately

17  reflect the intertwined nature of the USLIC insurance and the

18  EquityLine Agreement:

> Plaintiff alleges that USLIC breached duties
> or obligations that arise out of and relate
> directly to her decedent's loan agreement –
> the duty to pay back the money loaned.
> Without having entered into the Wells
> agreement, Plaintiff's decedent would not
> have enrolled in the credit insurance program
> underwritten by USLIC.  Plaintiff alleges
> that USLIC failed to timely and properly make
> a payment in the amount of the outstanding
> balance on the loan that she was required to
> pay under the Wells agreement.  Plaintiff,
> therefore, must rely on the existence and
> terms of the Wells agreement (and her
> obligations thereunder) in order to assert

1  　　　　her claims.  She must rely not only on its
2  　　　　mere existence, but on specific terms of the
   　　　　agreement with respect to the amount of the
   　　　　loan and its repayment.  Plaintiff cannot
3  　　　　simultaneously rely on the existence of the
   　　　　Wells agreement for the purposes of asserting
4  　　　　her claims while denying the application of
   　　　　certain terms therein (the arbitration
5  　　　　provision).

6  USLIC cites *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen*

7  *GMBH,* 206 F.3d 411, 418 (4th Cir.2000)("In the arbitration

8  context, the doctrine [of equitable estoppel] recognizes that a

9  party may be estopped from asserting that the lack of his

10 signature on a written contract precludes enforcement of the

11 contract's arbitration clause when he has consistently maintained

12 that other provisions of the same contract should be enforced to

13 benefit him.")

14 　　　USLIC further asserts that the Fourth Circuit addressed a

15 situation similar to that presented in this case, citing *American*

16 *Bankers Ins. Group v. Long*, 453 F.3d 623 (4th Cir.2006).[1]

17 　　　In *American Bankers Ins. Group*, the Longs sued ABIG on

18 claims relating to a promissory note purchased by the Longs.  The

19 Longs' complaint alleged that TLP sold automobile insurance

20 policies underwritten by ABIG to the general public and that

21 because ABIG did not have enough funds to pay claims on the

22 policies, it persuaded TLP to offer approximately $18 million of

23 ─────────────────────

24 　　　[1]USLIC also refers to an unreported decision from the Central
   District of California, *Capolongo v. Assurant Solutions*, No. CV-04-
25 8385 R (Ssx).  Attached to the reply brief is a copy of Judge
   Real's Order granting a motion to compel arbitration.  The Order is
26 contains no factual background or analysis and is of no use to the
   resolution of this motion.

1   worthless promissory notes to the public to fund the insurance.

2   The Longs alleged that, as part of its fraudulent scheme, ABIG,

3   knowing that TLP would be unable to pay the promissory notes,

4   structured them so that ABIG was in the position of first

5   priority in the event of default.  The Longs alleged that they

6   purchased a promissory note from TLP.  The promissory noted was

7   appended to and its terms 'incorporated ... by reference" into a

8   Subscription Agreement.  The Subscription Agreement contained an

9   arbitration clause providing "that any dispute, controversy or

10  claim arising out of or in connection with, or relating to, any

11  subscription of the Note, or any breach or alleged breach hereof,

12  including allegations of violations of federal or state

13  securities law" shall be subject to arbitration.  The Longs and

14  TLP were signatories to the Subscription Agreement; ABIG was not.

15  453 F.3d at 625.  The district court denied ABIG's motion to

16  compel arbitration, holding that the Longs were not equitably

17  estopped from asserting that ABIG was not a signatory to the

18  arbitration clause because their causes of action in the

19  complaint were based on theories of liability other than breach

20  of the obligations on the promissory note.  *Id.* at 626.  In

21  reversing the district court, the Fourth Circuit held in

22  pertinent part:

23          ABIG ... contends that even if the 'rely on'
            and 'direct benefit' tests are identical for
24          purposes of this case, estoppel is proper
            here because the Longs' individual claims
25          essentially allege that the duties created by
            the Notes were breached.  The Longs argue
26          that estoppel is not proper because they do

not assert a claim for breach of the Note.

In support of their counter-argument, the Longs point to *R.J. Griffin*.  There, a builder had entered into a contract containing an arbitration clause with the landowner to build condominiums ...  After the landowner sold the individual units, the new unit owners complained that the units leaked water, and they sued the builder in state court for negligence and breach of the implied warranty of good workmanship ... The builder filed a petition to compel arbitration of the owners' lawsuit, asserting that the owners should be equitably estopped that the arbitration clause did not apply to them because their state-court claims depended on the existence of a contract containing the arbitration clause ... On appeal of the district court's denial of the petition, we rejected this argument, concluding that the owners' underlying suit did not seek a 'direct benefit' from the contract ..., because their negligence and warranty causes of action were not based on any breach of the contract, but were instead based on duties created by state tort law ... The Longs argue that, like the owners in *R.J. Griffin*, their underlying complaint does not allege that ABIG breached a duty created by the Note.

We disagree.  The Longs' underlying complaint is different from the owners' complaint in *R.J. Griffin* in a significant way.  In *R.J. Griffin*, the duties that the builder owned the owners (and allegedly breached by the faulty construction of the condominiums) were created entirely by state tort law; if the builder and landowner had never entered into the building contract, the builder still could have been liable in tort to the owners ... Here, by contrast, if TLP had never issued the Note, the Longs would have had no basis for recovery against ABIG.  Each of the Longs' individual claims - interference with contract, securities fraud and negligence, civil conspiracy, unjust enrichment and rescission, and violation of SCUTPA - are dependent upon their allegation that ABIG breached a duty created 'solely by [the

> Note]' ..., for without the alleged breach of
> the Note, the Longs would have had no cause
> to complain.  And although each of the Longs'
> individual claims is phrased in tort, the
> Longs 'may [not] use artful pleading to avoid
> arbitration,' because, at root, those claims
> attempt 'to hold [ABIG] to the terms of [the
> Note.' ....

*Id.* at 629-630.

USLIC asserts that, as in *American Bankers Ins. Group*, "but for the loan documents containing the arbitration clause, there would be no agreement with USLIC; thus, the two are inextricably bound and USLIC may compel arbitration."

Plaintiff further opposes this motion on the ground that the insurance policy does not contain an arbitration provision.  The terms of the arbitration provision in the EquityLine Agreement limit arbitration to disputes between Wells Fargo and the borrower and explicitly precludes the use by third parties of the arbitration provision.

USLIC replies that principals or agents of a party to an arbitration agreement may be bound on ordinary agency or contract principles.  *See Letizia v. Prudential Bache Securities, Inc.*, *supra*, 802 F.2d at 1187 ("Other circuits have held consistently that nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles."); *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777 (2nd Cir.1995)("Traditional principles of agency law may bind a nonsignatory to an arbitration agreement.").  USLIC argues:

> Because the USLIC contract of insurance is
> inextricably bound with the terms of the

22

1
2
3
4
5

> Wells agreement, for purposes of the
> agreement, the 'Bank' and USLIC should be
> treated the same under the law for purposes
> of enforcing the arbitration provision, or
> any provisions, that relate to the servicing
> of the loan ... The USLIC coverage clearly
> relates to servicing of the loan inasmuch as
> the benefits paid, if any, are to be applied
> to the balance of the loan.

6       Plaintiff further argues that the insurance contract itself

7  precludes incorporation of the EquityLine Agreement's arbitration

8  provision.  Plaintiff refers to the Certificate of Insurance

9  Schedule attached as an exhibit to Plaintiff's Declaration in

10 opposition to the motion to compel arbitration:

11
12
13

> The Group Policy, the Application for the
> Group Policy, and the attached Application of
> Borrower are the complete contract of
> insurance.

This provision, Plaintiff contends, precludes by its terms any

14
15 incorporation of the terms of the EquityLine Agreement:

16
17
18

> Defendant's reasoning would allow it to
> incorporate a provision explicitly excluded,
> and, in addition, compel arbitration under a
> contract it drafted when no such arbitration
> could be compelled against it.

19       This is a close question.  Although USLIC's contention that

20 Plaintiff's claims depend on the EquityLine Agreement because the

21 insurance was purchased to secure repayment of the line of credit

22 and the amount of the outstanding must be determined by reference

23 to the line of credit, Plaintiff's claims do not otherwise

24 involve any of the terms and conditions of the EquityLine or any

25 breach of those terms.  In addition, the arbitration provision in

26 the EquityLine Agreement specifically excludes arbitration of

claims of third parties.  USLIC's contention that it was an agent of Wells Fargo in issuing the insurance policy is unsupported by evidence.  USLIC did not offer any evidence that it is a designated agent for Wells Fargo.  In any event, Plaintiff's claims against USLIC relate to a dispute between Plaintiff and USLIC over performance of the terms of the insurance policy, not to a dispute between Plaintiff, Wells Fargo, and USLIC.  Wells Fargo has no dog in this hunt.  USLIC has not demonstrated that degree of relatedness or intertwining that allows a non-signatory to compel arbitration against a signatory of an agreement containing an arbitration provision.

Plaintiff argues that California consumer protection laws also preclude arbitration in this case.

Plaintiff refers to California Insurance Code § 10207(a) that "[t]he policy, the application of the employer and the individual applications, if any, of the employees constitute the entire contract of insurance", and to California Insurance Code § 10113 that "[e]very policy of life ... insurance issued ... within this State ... shall contain and be deemed to constitute the entire contract between the parties and nothing shall be incorporated therein by reference to any ... other writings of either of the parties thereto or any other person, unless the same are indorsed upon or attached to the policy ...."

Plaintiff argues that Sections 10207(a) and 10113 are fundamentally consumer protection statutes in that they exist to help assure that the consumer is aware of their position with

24

respect to the insurance company.  Relying on *Standard Sec. Life Ins. Co. of New York v. West*, 267 F.3d 821 (8th Cir.2001) and *Smith v. PacifiCare Behavioral Health of California, Inc.*, 93 Cal.App.4th 139, *cert. denied*, 537 U.S. 818 (2002), Plaintiff contends that these statutes are not preempted by the Federal Arbitration Act.

The McCarran-Ferguson Act, 15 U.S.C. § 1011, *et seq.*, prevents inadvertent federal preemption of a state statute regulating the insurance industry.  15 U.S.C. § 1012(b) provides in pertinent part:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance ....

*Smith v. PacifiCare Behavioral Health* involved a contention by individuals insured by a health care service plan that the arbitration clause in the plan failed to comply with the statutory disclosure requirements of California Health and Safety Code § 1363.1.[2]  The Court of Appeal held that the arbitration

---

[2]California Health and Safety Code § 1363.1 provides:

> Any health care service plan that includes terms that require binding arbitration to settle disputes and that restrict, or provide for a waiver of, the right to a jury trial shall include, in clear and understandable language, a disclosure that meets all of the following conditions:
>
> (a) The disclosure shall clearly state whether the plan uses binding arbitration to settle disputes, including specifically whether the

clause was not enforceable because it did not comply with Section 1363.1.  Further, although the Federal Arbitration Act has been held to preempt Section 1363.1, the McCarran-Ferguson Act overrode the FAA and abrogated its preemptive effect. Application of the FAA would have the effect of invalidating, impairing, and superseding the operation of Health and Safety Code § 1363.1, and the FAA does not specifically relate to the business of insurance.  Since health service plans are engaged in the business of insurance, and since Health and Safety Code § 1363.1, was a statute enacted for the purpose of regulating the

---

plan uses binding arbitration to settle claims of medical malpractice.

(b) The disclosure shall appear as a separate article in the agreement issued to the employer group or individual subscriber and shall be prominently displayed on the enrollment form signed
by each subscriber or enrollee.

(c) The disclosure shall clearly state whether the subscriber or enrollee is waiving his or her right to a jury trial for medical malpractice, other disputes relating to the delivery of service under the plan, or both, and shall be substantially expressed in the wording provided in subdivision (a) of Section 1295 of the Code of Civil Procedure.

(d) In any contract or enrollment agreement for a health care service plan, the disclosure required by this section shall be displayed immediately before the signature line provided for the representative of the group contracting with a health care service plan and immediately before the signature line provided for the individual enrolling in the health care service plan.

business of insurance, the McCarran-Ferguson Act precluded application of the FAA.

However, as USLIC contends, California Insurance Code §§ 10207(a) and 10113 relate to the regulation of *health* insurance, not life insurance.  Further, USLIC seeks to compel arbitration pursuant to the arbitration provision of the EquityLine Agreement, not pursuant to any arbitration provision in the insurance policy itself.[3]

Plaintiff further argues that the California Insurance Code requires additional disclosures be made in connection with an arbitration provision in a disability policy, referring to California Insurance Code § 10123.19(a):

> (a) Any disability insurance policy that includes terms that require binding arbitration to settle disputes and that restrict, or provide for a waiver of the right to a jury trial shall include, in clear and understandable language, a disclosure that meets all of the following conditions:
>
> (1) The disclosure shall clearly state whether the plan uses binding arbitration to settle disputes, including specifically whether the plan uses binding arbitration to settle claims of medical malpractice.

---

[3]If Sections 10207(a) and 10113 were found to apply, USLIC argues that the Federal Arbitration Act would preempt them because these provisions single out arbitration clauses, rather than seeking to regulate contracts generally. USLIC *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 686-687 (1996).  *Casarotto* does not support USLIC's position.  The arbitration provision at issue in *Casarotto* was in a franchise agreement, not an insurance contract.  In *Standard Life Ins. Co. of New York v. West, supra*, the Eighth Circuit held that an arbitration provision in a disability insurance policy was inverse-preempted under the McCarran-Ferguson Act by a provision of the Missouri Arbitration Act prohibiting arbitration clauses in insurance contracts.

**(2) The disclosure shall appear as a separate article in the agreement issued to the employer group or individual subscriber and shall be prominently displayed on the enrollment form signed by each subscriber or enrollee.**

**(3) In any disability insurance policy, the disclosure required by this section shall be displayed immediately before the signature line provided for the representative of the group contracting with a disability insurer and immediately before the signature line provided for the individual enrolling in the policy.**

Although Plaintiff acknowledges that separate disability insurance was not purchased by Mr. Mundi, the "agreement form" contains numerous references to disability coverage.  Therefore, Plaintiff contends, the requirements of Section 10123.19 should apply and were not satisfied with regard to the policy sold to Mr. Mundi.  Plaintiff further refers to the definition of disability insurance set forth in California Insurance Code § 106(a)("Disability insurance includes insurance appertaining to injury, disability or death resulting to the insured from accidents, and appertaining to disablements resulting to the insured from sickness").  Therefore, Plaintiff argues, the death benefit coverage extended to Mr. Mundi under the USLIC policy can reasonably be construed to fit both the definition of life insurance and the definition of disability insurance.

However, the arbitration provision at issue is not contained in a Certificate of Insurance but, rather, the EquityLine Agreement between Plaintiff and Wells Fargo.  The policy that was issued to Plaintiff is not disability insurance as defined by

28

Insurance Code § 106.  As USLIC asserts, the policy is "credit life insurance" under California Insurance Code § 779.2, because the line of credit was for a period of ten years.[4]  *See* Section 4 of the EquityLine Agreement: "My account has a Draw Period of 10 years from the date of this Agreement."  Plaintiff did not purchase disability insurance from USLIC.  Finally, Insurance Code § 10123.19 does not relate to life insurance specifically, or even to credit disability insurance generally.  Rather, Section 10123.19 applies to hospital and medical expense insurance for disability under a group plan:

> The intent that this code section apply only to that discrete type of health insurance is clearly evidenced by the fact that it provides the disclosure for jury trial waiver must include 'whether the plan uses binding arbitration to settle claims of medical malpractice.'  Inclusion of the medical malpractice language does not logically fit in a section applicable to life insurance.

---

[4]California Insurance Code § 779.2 provides in pertinent part:

> All life insurance and all disability insurance sold in connection with loans or other credit transactions shall be subject to the provisions of this article, except (a) such insurance sold in connection with a loan or other credit transaction of more than ten years during, and (b) such insurance where its issuance is an isolated transaction on the part of the insurer not related to an agreement or a plan or regular course of conduct for insuring debtors of the creditor. Nothing in this article shall be construed to relieve any person from compliance with any other applicable law of this state, including, but not limited to, Article 6.5 (commencing with Section 790), nor shall anything in this article be construed so as to alter, amend, or otherwise affect existing case law.

29

Plaintiff further argues that California consumer protection law defeats USLIC's position in another respect.  Plaintiff cites *Davis v. Blue Cross of Northern California*, 25 Cal.3d 418, 430-431 (1979):

> These statutes reflect the Legislature's recognition that an important component of any insurance arbitration procedure is the requirement that insureds be given timely and meaningful notice of the procedure so that they can realistically resort to arbitration if they decide to do so ....
>
> The trial court in the instant case found that Blue Cross knew that in many instances its insureds would not be aware of the arbitration clause and that, despite this knowledge, Blue Cross deliberately decided not to inform its insureds of the arbitration procedure.  In this context, the practical effect of the insurer's practice was to transform its arbitration clause into a unilateral provision, establishing a procedure to which the insurer could require its insureds to resort when Blue Cross deemed it advisable, but one that would not generally provide a speedy, economic or readily accessible remedy for the bulk of Blue Cross' uninformed insureds.
>
> We think the trial court was fully justified in finding that Blue Cross had breached its duty of good faith and fair dealing in adopting such a course of conduct.  Blue Cross clearly was not giving its insureds' interests 'as much consideration ... as ... its own' in failing to advise them of their rights to demand arbitration of any disagreement with the insurer.  Having rejected plaintiffs' claims without so much as calling to their attention their potential remedy of arbitration and having thereby compelled plaintiffs to resort to litigation, Blue Cross is now hardly in a position to reverse itself and to invoke the arbitration process which it left to repose in plaintiffs' dark ignorance.

In her declaration submitted in opposition to this motion to compel arbitration, Plaintiff avers in pertinent part:

> 3.   Following my husband's death, I made a claim on the insurance policy with [USLIC] following their procedures.
>
> ...
>
> 5. [USLIC] did not bring up the issue of arbitration with me in any way until after this lawsuit was filed.

Because USLIC failed to advise Plaintiff of its position that arbitration was mandatory at the time USLIC denied Plaintiff's claim, USLIC, pursuant to *Davis*, waived any claim to arbitration.

USLIC replies that this case is factually distinguishable from *Davis*.  In *Davis*, the arbitration provision was contained in the Blue Cross policy and Blue Cross clearly had knowledge of its existence.  Here, USLIC contends, the arbitration provision was not contained in the insurance policy, but in the EquityLine Agreement.  This is nonsensical.  If USLIC seeks to rely on an arbitration agreement, it has a duty to know about it and to advise its insured.

Secondly, USLIC distinguishes *Davis* because Plaintiff did not seek to appeal the denial of her claim prior to filing this action.  In *Davis*, the trial court found that, even after learning that its insureds did not agree with the determinations as to benefits available under the policy, Blue Cross failed to bring the arbitration procedure to its insureds' attention; instead Blue Cross simply reiterated its rejection of the insureds' claims.  *See Davis*, *supra*, 25 Cal.3d at 426.  Here,

31

1   USLIC contends, Plaintiff did not challenge its denial of her

2   claim for benefits prior to filing this action.  When this action

3   was filed, USLIC asserts it timely raised the arbitration

4   provision in the EquityLine Agreement.

5       USLIC's attempts to distinguish *Davis* are not persuasive.

6   Because USLIC intended to rely on an arbitration provision in a

7   contract separate from the insurance policy, USLIC should have

8   brought that intention to Plaintiff's attention before Plaintiff

9   filed this action.

10                          <u>**CONCLUSION**</u>

11      For the reasons stated above, USLIC's motion to compel

12  arbitration is DENIED.

13      IT IS SO ORDERED.

14  **Dated:   May 29, 2007**          <u>      /s/ Oliver W. Wanger      </u>
                                       UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

                                32